THOMAS H. CLARKE, JR. (SBN 47592)
ANDREW M. WOLFE (SBN 114076)
TIMOTHY A. DOLAN (SBN 209674)
ROPERS, MAJESKI, KOHN & BENTLEY
201 Spear Street, Suite 1000
San Francisco, CA 94105-1667
Telephone: (415) 543-4800
Facsimile: (415) 972-6301
Email: tclarke@rmkb.com
awolfe@rmkb.com
tdolan@rmkb.com

Attorneys for Plaintiff
SAMUEL DIGIACOMO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL DIGIACOMO,<br><br>    Plaintiff,<br><br>    v.<br><br>EX'PRESSION CENTER FOR NEW MEDIA, INC., d/b/a EX'PRESSION COLLEGE FOR DITIGAL ARTS, and Does 1 through 100,<br><br>    Defendant. | CASE NO. C-08-01768 MHP<br><br>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS OR, ALTERNATIVELY, STAY CASE<br><br>Date:       September 8, 2008<br>Time:      2:00 P.M.<br>Location:  Courtroom 15, 18th Floor<br>               450 Golden Gate Ave.<br>               San Francisco, CA 94102<br>Judge:     Hon. Marilyn Hall Patel |

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

RC1/5169117.1/CB12

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

## **TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................- 1 -

II. STATEMENT OF FACTS.................................................................................................- 2 -

III. ARGUMENT ...................................................................................................................- 5 -

   A.   The Scope Of The Arbitration Provision And Whether The Arbitration Provision Is Unconscionable Are Issues To Be Decided By This Court. ............................................- 5 -

   B.   Samuel's Claims Do Not Come Within The Scope Of The Arbitration Provision. ........- 7 -

   C.   The Arbitration Provision Is Unconscionable And Thus Should Not Be Enforced. .......- 8 -

      1.   The Enrollment Procedure That Resulted In The Arbitration Provision Was Procedurally Unconscionable..............................................................................- 8 -

      2.   The Arbitration Provision Is Substantively Unconscionable. ......................................- 9 -

   D.   In The Event That Ex'pression Disputes The Facts Presented In This Opposition,  Any Genuine Issue Of Material Fact Should Be Tried By Jury. ...........................................- 11 -

   E.   In The Event That The Motion To Compel Is Granted, This Lawsuit Should Be Stayed Rather Than Dismissed. ..............................................................................................- 12 -

IV. CONCLUSION.................................................................................................................- 12 -

RC1/5169117.1/CB12                    i

PLAINTIFF'S MEMO IN OPP TO DEFT'S MOT TO COMPEL ARBITRATION AND TO DISMISS...

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Geoffroy v. Washington Mutual Bank*, 484 F. Supp. 2d 1115 (S.D. Ca. 2007) ..... 6, 7, 8, 9, 12

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) .................................... 6

*John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964) ................................... 6

*Morrison v. Shankle*, 317 F.3d 646 ...................................................................... 11

*Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) .............................. 6, 7, 8, 9, 11

## STATE CASES

*Armendariz v. Foundation Psychcare Services, Inc.*, 24 Cal. 4th 83 (2000) .................. 8, 9, 11

*Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495 (2005)] .................... 11

*Gentry v. Superior Court*, 42 Cal. 4th 443 (2007) ..................................................... 8

*Thompson v. Toll Dublin, LLC*, First District Court of Appeal, August 13, 2008, 2008 D.A.R.
    12,724 ……………………………………………………………...……………7, 8, 9, 11

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003)……………….……………………………..8

## FEDERAL STATUTES

9 U.S.C. § 3 …………………………………….       ………………    12

29 U.S.C. § 794 .................................................................................................. 11

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*…………………………….    ……………    5

F.R.Civ.P. 54(d)……………………………………………….    …….        ……..……11

## STATE STATUTES

C.C.P. § 51 ……………………………….    …………………………………    ……..……11

C.C.P. §52(a)        ……………… ……        …………………………………………..    …….11

PLAINTIFF'S MEMO IN OPP TO DEFT'S MOT TO COMPEL ARBITRATION AND TO DISMISS...

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Samuel DiGiacomo ("Samuel"), a young man who suffers from Asperger's Syndrome and Bipolar Disorder, has brought this lawsuit to challenge his expulsion from Ex'pression College For Digital Arts ("Ex'pression"). He claims that the decision to expel him was undertaken in a manner that violated several federal and state laws. (See Complaint, 1 – 13.)

At the time he enrolled at Ex'pression, Samuel signed a printed Enrollment Agreement form that contains an arbitration provision. Ex'pression now moves to compel arbitration pursuant to that provision. As we demonstrate below, that motion should be denied because it is factually defective, because Samuel's causes of action are outside the scope of the arbitration provision Expression seeks to enforce, and because that provision is unconscionable.

Ex'pression's motion is based in part on accusations that are completely irrelevant and are not supported by any evidence or any citation to the record of this case, all in flagrant violation of the rules of this Court. (Statement of Facts, *infra*, at note 1.) Moreover, Ex'pression's motion ignores relevant facts concerning the circumstances under which the Enrollment Agreement was executed and the commercial arbitration procedures Ex'pression is attempting to enforce. (Statement of Facts, *infra*.)

Whether Samuel's claims come within the scope of the arbitration provision Ex'pression seeks to enforce and whether that provision is unconscionable are issues for this Court to decide. Ex'pression's contention that an arbitration agreement, once made, is not judicially reviewable is plainly wrong. (Argument, *infra*, Part A.)

The causes of action alleged in Samuel's complaint do not come within the scope of the arbitration provision. Those causes of action challenge his *expulsion*; the arbitration provision applies, by its own terms, only to "enrollment" issues. (*Id.*, Part B.)

Further, the arbitration provision Ex'pression seeks to enforce is both procedurally and substantively unconscionable. (*Id.*, Parts C-1 and C-2.)

Ex'pression has chosen to ignore the unconscionability issues thus far, despite being put on notice of those issues by a letter from Samuel's counsel sent well before Ex'pression filed this motion. In the event that Ex'pression's reply papers raise any genuine issues of material fact,

- 1 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1   those issues should be resolved by jury trial.  (*Id.*, Part D.)

2         Even if this Court were to grant Ex'pression's motion to compel arbitration, the Court

3   should deny its motion to dismiss the case, and should instead stay this case until arbitration is

4   completed.  (*Id.*, Part E.)

5

6   ## II.     STATEMENT OF FACTS[1]

7         Samuel is a young man who suffers from Asperger's Syndrome, a form of autism

8   characterized by, among other traits, difficulty with social interactions.  He also suffers from

9   Bipolar Disorder, commonly referred to as manic-depression.  Prior to becoming an Ex'pression

10  student, he had no education beyond high school.  (Declaration of Samuel DiGiacomo, submitted

11  herewith ["Samuel Dec."], 2:3 – 2:10 and 2:27 – 3:2.)

12        On September 18, 2006, Samuel went to Ex'pression to begin the process for being

13  admitted as a student.  He was accompanied by his mother, Jacqueline DiGiacomo ("Mrs.

14  DiGiacomo").  They met with Klint Schahrer in the Ex'pression Admissions Office.  Mrs.

15  DiGiacomo informed Mr. Schahrer that Samuel had Asperger's Syndrome and Bipolar Disorder;

16  both disorders and the medications he was taking for them were noted in the Student Health

17  Notice form Samuel filled out and submitted to Ex'pressions that day.  (Samuel Dec., 1: 24 – 2:10

18  and Exhibit A; Declaration of Jacqueline DiGiacomo, submitted herewith ["J. DiGiacomo Dec."],

19  1:26 – 2:7.)

20        Samuel was also given a number of other Ex'pression forms to fill out and return.  When

21  he had done so and had taken a short test, Ex'pression admitted him as a student and he applied

22  for financial aid.  The entire enrollment process from the time he and his mother arrived at

23  _____

24  [1] Unfortunately, Ex'pression has seen fit to include in its Statement of Facts a number of sensational accusations
    concerning conduct Samuel allegedly engaged in sometime after his enrollment. (Def. Mem., 3:23 – 4:9.) Those

25  accusations are clearly irrelevant to the issue raised by Ex'pression's motion, which is simply whether Samuel's
    claims against Ex'pressions should be arbitrated or not. Moreover, those accusations are not supported by citation to

26  the record or by any evidence whatsoever, in violation of the rules of this Court. (See Civil Local Rule 7-5(a).)  It
    is apparent that Ex'pression has made these accusations in an underhanded effort to influence the disposition of this

27  motion by flagrantly improper means. (Although we do not wish to burden the record with further discussion of the
    pseudo-issue Ex'pression has improperly attempted to raise, we feel compelled to note that, as Ex'pression well

28  knows, Samuel emphatically denies those accusations. (See, e.g., Joint Case Management Statement, 2:15 – 2:22
    [Attachment B hereto].)

RCI/5169117.1/CB12                              - 2 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1   Ex'pression until their departure took approximately two hours. (Samuel Dec., 1:24 – 3:11; J.

2   DiGiacomo Dec., 1:26 – 3:27.)

3        Among documents he filled out and returned that day was a printed Enrollment

4   Agreement form.  A copy is set forth in Attachment A hereto for convenient reference.[2] As

5   requested, he signed it in the seven places that called for his initials or signature.  The Enrollment

6   Agreement begins with an introductory section that contains the following language in bold-face

7   11-point type:

8

9          **Any questions or problems that are not satisfactorily answered
           or resolved by the school should be directed to the Bureau of**

10         **Private Postsecondary and Vocation Education, 1625 North
           Market Blvd., Suite S202, Sacramento CA 95834.**

11

12   (Attachment A hereto, at page 1.)

13       The printed Enrollment Agreement form then recites that the student (in this case,

14   Samuel) has "been given a copy of the complaint and grievance procedure." (*Ibid*.)  It is not clear

15   whether this is a reference to a complaint and grievance procedure established by Ex'pression or

16   the above-mentioned state agency, but in any event Samuel did not receive any copy of any

17   procedures to which the Enrollment Agreement may be referring.[3]

18       On the second page of the Enrollment Agreement is a provision that pertains to

19   arbitration.  Unlike the introductory language just quoted, the arbitration provision is not set forth

20   in 11-point or boldface type, but is instead set forth in 9-point regular type.  (*Id.*, page 2 at section

21   6.1.)  Whereas the introductory language pertains to "*any* questions or problems" a student may

22   have, the arbitration provision pertains only to disputes "arising from *enrollment*." (*Ibid*,

23   emphasis added.)

24       Ex'pression did not inform Samuel or his mother that the Enrollment Agreement

25   _____

26   [2]  The Enrollment Agreement is authenticated and set forth in declarations submitted herewith.  (Samuel Dec., 2:11 –

27   2:19 and Exhibit B; J. DiGiacomo Dec. 3:14 – 3:23 and Exhibit B.)

28   [3]  Samuel's attorneys requested Ex'pressions to provide the "copy" in question more than two months ago, but that
     request has not been granted.  (Clarke Dec., ¶ 3 and Exhibit A.)

RC1/5169117.1/CB12                          - 3 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  contained the above-mentioned arbitration provision, or even mention the subject of arbitration,

2  prior to the enrollment process on September 18, 2006, during that enrollment process, or at any

3  time between his enrollment and the commencement of this litigation. (Samuel Dec., 2:11 – 2:24;

4  J. DiGiacomo Dec., 3:8 – 3:23.)

5      The arbitration provision set forth in the Enrollment Agreement states that such

6  arbitrations are to be conducted by the American Arbitration Association "under its Commercial

7  Rules." Those "Commercial Rules" are not further identified. It is thus unclear whether they are

8  the ones that were in effect at the time the Enrollment Agreement was signed (September 18,

9  2006), the ones that are in effect on the date a claim is made, the ones that are in effect now, or

10  the ones in effect at some other time. (See Attachment A hereto, page 2 at ¶ 6.1.)

11      Ex'pression has never provided Samuel or his mother with a copy of any such AAA

12  Commercial Rules. Additionally, Ex'pression has never discussed with Samuel or his mother the

13  differences between the judicial remedies that would be available to Samuel in court and the

14  remedies that would be available to him pursuant to the AAA's Commercial Rules. (Samuel

15  Dec., 2:11 – 2:24; J. DiGiacomo Dec., 3:8 – 3:23.)

16      In its motion to compel arbitration Ex'pression does not identify the AAA Commercial

17  Rules that supposedly govern the arbitration it seeks, much less provide this Court with a copy of

18  them. (See Def. Mem.; Sinrod Dec.; Thompson Dec.)

19      The Commercial Rules of the American Arbitration Association that are in effect at the

20  present time provide as follows:

21  • They require that a party filing a claim pay an Initial Filing Fee of $750 if the claim is

22      between $0 and $10, 000, and require the claimant to pay even larger fees if the claim is

23      more than $10,000. For example, a claimant seeking more than $1 million is required to

24      pay an Initial Filing Fee of at least $8,000. (Clarke Dec., ¶ 2 and Exhibit A, pages 20

25      [Rule 49] and 26 [Fees schedule][4].)

26

27  _____

28  [4]   The AAA apparently has discretion, but is not required, to defer or reduce administrative fees "in the event of extreme hardship." (*Id.* at page 20 [Rule 49].)

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

- They require that when a case proceeds to the first hearing a Case Service Fee of at least $200 is payable; like the Initial Filing Fee, Case Service Fees increases with the size of the claim. For example, a claimant who seeks more than $1 million is required to pay a Case Service Fee of at least $3,250. (*Id.*, page 26 [Fees].)

- They require that the arbitrator be "compensated at a rate consistent with the arbitrator's stated rate of compensation." (*Id.*, page 20 [Rule 51].)

- They do not require that the prevailing party be awarded the Initial Filing Fee, Case Service Fee, arbitrators fee or any other cost the prevailing party has incurred. Instead, these rules give the arbitrator discretion to assess and apportion all fees, expenses and compensation "as the arbitrator deems is appropriate." (Id., page 18 [Rule 43 (b) and (c).

On April 7, 2007, after he had successfully completed four semesters, Ex'pression informed Samuel that he was expelled. (Samuel Dec., 3:12 – 3:14; J. DiGiacomo Dec., 4:2 – 4:3.)

This lawsuit and Ex'pression's motion to compel arbitration followed.

On June 11, 2008, Samuel's attorneys sent counsel for Ex'pression a letter that, inter alia, requested a copy of the "complaint and grievance procedure" referred to on the first page of the Enrollment Agreement and put Ex'pression on notice of Samuel's contention that the arbitration provision is procedurally and substantively unconscionable. (Clarke Dec., ¶ 3 and Exhibit B at pages 1 -2.)

### III.    ARGUMENT

**A.    The Scope Of The Arbitration Provision And Whether The Arbitration Provision Is Unconscionable Are Issues To Be Decided By This Court.**

There is no dispute that both parties signed the Enrollment Agreement, that the Enrollment Agreement contains an arbitration provision, and that the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, applies to it. Ex'pression apparently contends that, once it is determined that an arbitration agreement "exists," this Court is absolutely required to compel arbitration. (Def. Mem., 4:24–6:17.) In effect, Ex'pression is saying that arbitration agreements, once made, are

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    not judicially reviewable.  That audacious argument is plainly wrong.

2          Whether the claims asserted in a lawsuit come within the scope of an arbitration provision

3    is an issue for the courts to decide.  See *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83

4    (2002) ("The question of whether the parties have submitted a particular dispute to arbitration,

5    e.g., the '*question of arbitrability*' is 'an issue for judicial determination [u]nless the parties

6    clearly and unmistakably provide otherwise." (alternation in original, citation omitted); *John*

7    *Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964) ("the duty to arbitrate being of

8    contractual origin, a compulsory submission to arbitration cannot precede judicial determination

9    that the … agreement does in fact create such a duty."); *Nagrampa v. Mailcoups, Inc.*, 469 F.3d

10   1257, 1268 (9th Cir. 2006) (*en banc*) ("The arbitrability of a particular dispute is a threshold issue

11   to be decided by the courts."); *Geoffroy v. Washington Mutual Bank*, 484 F.Supp.2d 1115, 1118

12   (S.D. Ca. 2007).[5]

13         The arbitration provision at issue in this case applies only to disputes "arising from

14   *enrollment*" at Ex'pression. (Attachment A, page 2 [¶ 6.1, emphasis added]).  That provision

15   stands in sharp contrast to the general resolution procedure - set forth in larger, bolder type at the

16   very beginning of the Enrollment Agreement -  that sweepingly applies to "[a]ny questions or

17   problems concerning this school." (*Id.*, page 1.)  Samuel's claims in this lawsuit do not arise out

18   of his *enrollment* at Ex'pression, but arise instead out of his *expulsion* from Ex'pression.[6]  In view

19   of the breadth of the general dispute resolution procedure and the narrowness of the arbitration

20   procedure, it can hardly be said that the parties have "clearly and unmistakably" provided that

21   Samuel's claims are subject to the arbitration provision.  Accordingly, the scope of the arbitration

22   provision must be determined by this Court.  *Howsam v. Dean Witter*, *supra*, 537 U.S. at 83.

23         Likewise, whether the arbitration provision is procedurally and substantively

24

25   [5]  As explained in *Nagrampa* and *Geoffroy*, if Samuel had disputed the validity of the entire Enrollment Agreement rather than simply the arbitration provision, the arbitrator might arguably have a broader role in determining

26   arbitrability. (*Ibid.*)  But Samuel does not dispute the validity of the entire Enrollment Agreement.  He simply contends that the arbitration provision does not compel him to arbitrate the causes of action asserted in this lawsuit.

27   [6] The term "enrollment" means to the act of enrolling or registering  for a class or school.  *Webster's Dictionary* (1913), at http://machaut.uchicago.edu/cgi-bin/WEBSTER.sh?WORD=enrollment, and *Encarta® World English Dictionary*

28   (N. Am. Ed.) at http://encarta.msn.com/encnet/features/dictionary/ DictionaryResults.aspx?refid=1861608579.

PLAINTIFF'S MEMO IN OPP TO DEFT'S MOT TO COMPEL ARBITRATION AND TO DISMISS...

1  unconscionable are issues that must be determined by this Court. The law has been too long and

2  too well settled for Ex'pression to pretend otherwise. *Nagrampa, supra*, 469 F.3d at 1264;

3  *Geoffroy, supra*, 484 F.Supp.2d at 1118.

4  **B.    Samuel's Claims Do Not Come Within The Scope Of The Arbitration Provision.**

5          As we have just shown, the Enrollment Agreement refers to two different dispute

6  resolution procedures:  (1) the introductory section of the agreement prominently and broadly

7  refers to "a complaint and grievance procedure" for resolving "[a]ny questions or problems

8  concerning this school which have not been satisfactorily resolved by the school"; and (2) section

9  6.1 of the agreement states more narrowly and inconspicuously that disputes about "enrollment"

10  are subject to the AAA's  Commercial Rules. (Attachment A, pages 1–2.) The causes of action

11  set forth in Samuel's complaint allege that his legal rights were violated by the manner in which

12  Ex'pression *expelled* him.  Those causes of action are not based on claims that his legal rights

13  were violated by the manner in which Ex'pression enrolled him.  Samuel did not agree to arbitrate

14  those causes of action.

15          That conclusion is strongly supported by a recent California case, *Thompson v. Toll*

16  *Dublin, LLC*, First District Court of Appeal, August 13, 2008, 2008 D.A.R. 12,724

17  ("*Thompson*"), a copy of which is set forth in Attachment B hereto.  In *Thompson*, as in this case,

18  the court was called upon to determine whether certain claims came within the scope of an

19  arbitration provision.  The court stated that the arbitration provision at issue should not be

20  considered in isolation, but should instead be interpreted in the context of the contract as a whole.

21  *Id.*, 2008 D.A.R. at 12,725.  In language fully applicable here, the court then stated:

22              The strong policy in favor of arbitration may not be used to permit a
23              party to enforce provisions of an arbitration agreement that, as here,
                either do not exist or were so poorly drafted that another party
24              cannot be presumed to have agreed to them.

25  *Id.*, 2008 D.A.R. at 12,746.

26          For these reasons, this Court should hold that the claims alleged in Samuel's complaint

27  fall outside the scope of the arbitration provision.

28

RCI/5169117.1/CB12                                          - 7 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

**C.**    **The Arbitration Provision Is Unconscionable And Thus Should Not Be Enforced.**

It is well settled that "unconscionability is a generally applicable contract defense, which may render an arbitration provision unenforceable." *Nagrampa, supra*, 469 F.3d at 1280; see *Geoffroy, supra*, 484 F.Supp.2d at 1118. It is equally well settled that unconscionability issues are to be decided under state contract law. *Ibid.* The arbitration provision at issue here is part of a California contract, so California contract law governs.

In assessing procedural and substantive unconscionability, the California courts apply a sliding scale, not unlike the sliding scale courts apply in deciding whether to issue a preliminary injunction. The more procedurally unconscionable a contract is found to be, the less evidence of substantive unconscionability is required, and vice versa. *Gentry v. Superior Court*, 42 Cal.4th 443, 468–469 (2007) [citing *Armendariz v. Foundation Psychcare Services, Inc.*, 24 Cal.4th 83, 114 (2000)]; *Thompson, supra*, 2008 D.A.R. at 12,746; see *Nagrampa, supra*, 469 F.3d at 1280.

Well before Ex'pression moved to compel arbitration, counsel for Samuel placed counsel for Ex'pression on notice of his position that the arbitration provision at issue here is procedurally and substantively unconscionable. (Clarke Dec., Exhibit B at page 2.) We are thus surprised to see that Ex'pression's motion completely ignores those issues. We demonstrate below that the arbitration provision at issue here is unconscionable both procedurally and substantively.

**1.**    **The Enrollment Procedure That Resulted In The Arbitration Provision Was Procedurally Unconscionable.**

The twin hallmarks of procedural unconscionability are oppression and surprise. *Gentry, supra,* 42 Cal.4th at 468 – 469. Both are present here.

Under California contract law, the analysis of oppression "begins with an inquiry into whether the contract is one of adhesion. *Armendariz, supra,* 24 Cal.4th at 113; *Thompson, supra*, 2008 D.A.R. at 12,746. The Enrollment Agreement is a classic contract of adhesion – a standardized, pre-printed form, drafted by the party of superior bargaining power, and presented to Samuel without any opportunity for negotiation. See *Armendariz, supra*, 24 Cal.4th at 113; *Thompson, supra*, 2008 D.A.R. at 12,746; *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). If he wanted to enroll at Ex'pression, he needed to sign and return Ex'pression's enrollment form.

RCI/5169117.1/CB12

- 8 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    Moreover, the manner in which the arbitration provision at issue here was imposed on

2    Samuel is permeated with surprise.  He was a person with mental disabilities and at the time he

3    was called upon to sign the Enrollment Agreement had no education beyond high school.  He

4    received no advance warning that the Enrollment Agreement he was required to sign contained an

5    arbitration provision.  The fact that a *different* dispute resolution procedure is more prominently

6    displayed in the introduction to the Enrollment Agreement obscured the presence and effect of the

7    arbitration provision.  There was no discussion of that provision or arbitration during the

8    enrollment process.  He was given little time to consider that provision.  Ex'pression did not

9    provide him with a copy of the AAA Commercial Rules to which that provision refers before he

10   was called upon to initial the arbitration provision and sign the Enrollment Agreement.  (Indeed,

11   *to this very day*, Ex'pression has failed to inform Samuel or this Court as to which version of the

12   AAA Commercial Rules Ex'pression seeks to apply in this case.)  Nor did Ex'pression provide

13   him with any information concerning the differences between court and arbitration expenses, or

14   the differences between the remedies available to him in court and the much more limited

15   remedies available to him under the AAA Commercial Rules.  As a result, Samuel was not made

16   aware that agreeing to arbitration pursuant to those rules entailed not only a waiver of his right to

17   trial by a jury, but also entailed an obligation to pay larger costs and a waiver of various other

18   rights – including his right to recover such costs in the event that he prevails.

19   For these reasons, this Court should determine that the arbitration provision is the product

20   of a high degree of procedural unconscionability.  See *Armendariz, supra*, 24 Cal.4th at 113 - 114;

21   *Thompson, supra*, 2008 D.A.R. at 12,746 – 12,747; *Nagrampa, supra*, 469 F.3d at 1280–1293.

22   **2.    The Arbitration Provision Is Substantively Unconscionable.**

23   A contract is substantively unconscionable if it is overly harsh or generates one-sided

24   results.  See *Geoffroy, supra*, 484 F.Supp.2d at 1118-1119.  A contract is also substantively

25   unconscionable if it limits statutorily imposed remedies.  *Armendariz, supra*, 24 Cal.4th at 103;

26   see also *Nagrampa, supra*, 469 F.3d at 1292 ("California courts refuse to enforce arbitration

27   provisions on public policy grounds if they impede the enforcement of nonwaivable statutory

28   rights.")  Moreover, an arbitration provision is substantively unconscionable if it is so

RCI/5169117.1/CB12                                    - 9 -

1    unforeseeably broad that it is not within the reasonable expectations of the plaintiff. *Thompson,*

2    *supra,* 2008 D.A.R. at 12,747. The arbitration provision at issue here fails on all three counts.

3    As we have demonstrated above, the effect of enforcing the arbitration provision would be

4    to require student claimants, such as Samuel in this case, to pay much larger filing fees than they

5    would have to pay in court; would require student claimants to pay substantial case management

6    fees they would not have to pay in court; and would require student claimants to pay some part of

7    the arbitrator's fees. In view of the fact that the *minimum* Initial Filing Fee under the AAA's

8    Commercial Rules is $750, Ex'pression's arbitration provision effectively bars its students from

9    obtaining any relief if they do not have $750 in their pocket. To obtain a hearing under the

10   AAA's Commercial Rules, student claimants would have to pay an additional Case Service Fee

11   of *at least* $200, and would apparently have to pay half the arbitrator's fees. See C.C.P. § 1284.2

12   (unless arbitration agreement otherwise provides, parties pay pro rata shares of all arbitrator fees

13   and expenses). Whether a student claimant might recoup any of those expenses would be entirely

14   within the discretion of the arbitrator, *even if the student claimant were the prevailing party.*

15   (AAA Commercial Rules 43(b) and (c), 49, 51 and Fee schedule [Clarke Dec., Exhibit A].)

16   Obviously, arbitration under the AAA's Commercial Rules imposes financial burdens that

17   Ex'pression is much more capable of bearing than student claimants such as Samuel would be.[7]

18   That the arbitration scheme chosen by Ex'pression is overly harsh and one-sided is further

19   demonstrated by the fact that, even within the confines of available AAA arbitration procedures,

20   Ex'pression deliberately selected the *Commercial* Rules – rules designed for the resolution of

21   disputes concerning private business transactions - instead of AAA rules that are much less

22   expensive and onerous for claimants. (See, e.g., AAA Consumer Rules and Employment Rules,

23   at www.adr.org.) Indeed, it would seem that by selecting the AAA's Commercial Rules

24   Ex'pression went out of its way to erect a financial barrier to student claims.

25   The courts refuse to enforce arbitration agreements where the potential costs of arbitration

26

27

---

28   [7] Samuel's father is employed as a paralegal by the firm that represents Samuel in this lawsuit. The firm is
representing his son in this case on a pro bono basis. (Clarke Dec., ¶ 4.)

RC1/5169117.1/CB12                    - 10 -

PLAINTIFF'S MEMO IN OPP TO DEFT'S MOT TO COMPEL ARBITRATION AND TO DISMISS...

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  are large enough to deter the plaintiff and other similarly situated individuals from vindicating

2  their statutory rights in the arbitral forum. *Armendariz, supra,* 24 Cal.4th at 103; *Morrison v.*

3  *Shankle,* 317 F.3d 646. 657–665; see also *Nagrampa, supra,* 469 F.3d at 1292–1293 [citing

4  *Boghos v. Certain Underwriters at Lloyd's of London,* 36 Cal.4th 495, 506–506 (2005)].   In this

5  case, the arbitration provision at issue not merely *impedes* the vindication of statutory rights, but

6  prevents student claimants from achieving such vindication.   This is well illustrated by Samuel's

7  claims.  If he prevails in court , he would be entitled to attorneys fees, penalties and costs.  See,

8  *e.g.,* 29 U.S.C. § 794, C.C.P. §§ 51 and 52(a), and F.R.Civ.P 54(d).  Under the AAA's

9  Commercial Rules, however, an arbitrator is completely free to deny such relief to prevailing

10  student claimants.

11       Finally, in view of the striking contrast between the broad dispute resolution procedure

12  prominently displayed at the beginning of the Enrollment Agreement and the narrow arbitration

13  provision inconspicuously set forth on the second page of that agreement, "the purported scope of

14  the arbitration provision[] exceeded [Samuel's] reasonable expectations. *Thompson, supra,* 2008

15  D.A.R. at 12,747.

16       For these reasons, this Court should determine that the arbitration provision exhibits a

17  high degree of substantive unconscionability.[8]

18  **D.    In The Event That Ex'pression Disputes The Facts Presented In This Opposition,**
    **Any Genuine Issue Of Material Fact Should Be Tried By Jury.**

19

20       As stated above, Ex'pression has chosen to ignore the issues of procedural and substantive

21  unconscionability - even though counsel for Ex'pression has been put on notice of the existence

22  of both those issues.  (Clarke Dec., Exhibit B.)  We anticipate that Ex'pression's reply papers

23  may now attempt to dispute some of the facts presented here.

24       If this Court concludes that there are genuine issues of material fact with regard to

25

26

27  [8] When courts find contracts to be unconscionable, it is sometimes argued that the contract can be saved by severing
    the offending portion. See, e.g., *Armendariz, supra,* 24 Cal.4th at 1121–1127.  Ex'pression's arbitration scheme

28  cannot be saved by severance.  As we have demonstrated, as applied to student claimants the offending provisions of
    the AAA's Commercial Rules are so numerous that severing them would make that arbitration procedure inoperable.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    Ex'pression's motion to compel arbitration, such issues should be resolved by jury trial.  See

2    *Geoffroy, supra*, 484 F.Supp.2d at 1119.[9]

3    **E.     In The Event That The Motion To Compel Is Granted, This Lawsuit Should Be Stayed Rather Than Dismissed.**

4

5    Ex'pression contends that, in the event its motion to compel arbitration is granted, this

6    lawsuit should be dismissed. (Def. Mem., 8:12–8:20.)  Accordingly, Ex'pression has moved to

7    dismiss Samuel's complaint pursuant to F.R.Civ.P. 12(b) and (6).  Those motions to dismiss

8    should be denied.

9    The correct course of action in the event that the motion to compel arbitration were to be

10   granted is the one explicitly prescribed by statute: to stay the action "until such arbitration has

11   been had in accordance with the terms of the agreement, providing that the applicant for the stay

12   is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

13

14               **IV.     CONCLUSION**

15   For the foregoing reasons, Ex'pression's motions to compel arbitration and to dismiss the

16   complaint should both be denied.

17   Dated: August 18, 2008                ROPERS, MAJESKI, KOHN & BENTLEY

18

19                                By: _Andrew M Wolfe_

20                                THOMAS H. CLARKE, JR.

21                                ANDREW M. WOLFE
                                 TIMOTHY A. DOLAN

22                                Attorneys for Plaintiff
                                 SAMUEL DIGIACOMO

23

24

25

26

27

28   [9] With this opposition, Samuel is submitting a demand for trial by jury as to such issues.

RCI/5169117.1/CB12                              - 12 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

# Exhibit A

# enrollmentAGREEMENT



Ex'pression College
for Digital Arts
6601 Shellmound Street
Emeryville, CA 94608

This agreement is made on the ___18___ day of __September__ 20_06_ by and between EX'PRESSION COLLEGE

FOR DIGITAL ARTS, herein referred to as ECDA and ___SAMUEL DIGIACOMO___ , herein referred to

as the STUDENT.

Student Address: ___4755 Louise Lane___
STREET ADDRESS/PO BOX

___Union City___     ___CA___     ___94507___
CITY    STATE    ZIP

Student Phone Number: ___(510) 487-1754___

---

**This enrollment agreement, when signed by the student and accepted by the school is a legally binding agreement.**

Ex'pression College for Digital Arts is located at 6601 Shellmound Street, Emeryville, CA 94608. All instruction is provided at this address.

**Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau of Private Postsecondary and Vocational Education, 1625 North Market Blvd., Suite S202, Sacramento, CA 95834.**

Student's Initials: _SD_. I have been given a copy of the complaint and grievance procedure.

**1.   ENROLLMENT INFORMATION:**

1.1   The student is enrolling in the program marked below, which is_____ academic months. Four Academic Years are required for completion of a Bachelor of Applied Science Degree.

☐ **Bachelor of Applied Science in Motion Graphic Design** (4 Academic Years)

ECDA's Motion Graphic Design Program develops students' knowledge and skills through an intensive series of visual design, animation, interactive and motion graphics theory courses. A total of _____ Semester Credit Units are required to complete the program.

☒ **Bachelor of Applied Science in Animation and Visual Effects** (4 Academic Years)

ECDA's Animation and Visual Effects Program is designed to enhance the student's knowledge and skills through an intensive series of courses including 3D modeling and animation, texture and lighting, compositing, digital film and video effects, graphics for the Internet and more. A total of _134_ Semester Credit Units are required to complete the program.

☐ **Bachelor of Applied Science in Sound Arts** (4 Academic Years)

ECDA's Sound Arts Program offers students the opportunity to take part in numerous recording sessions, to experience mixing for CD release, to lock audio for picture, to learn surround sound, to learn DVD authoring, and many other technologies. Students explore first-hand numerous live sound and lighting applications, acoustical design, developing an understanding of the psychology of the studio, and much more. A total of _____ Semester Credit Units are required to complete the program.

1.2   Please see the College catalog for detailed program descriptions.
Student Initials: _SD_. I have received a College catalog.

1.3   The starting date for the program of enrollment is _9/27/06_.

**2.   CLASS TIMES**

2.1   Although most classes occur between the hours of 8:00 am and 6:00 pm, ECDA is a 24-7 facility; labs and lectures may be scheduled accordingly.

**3.   GRADUATION REQUIREMENTS AND DOCUMENTS AWARDED**

3.1   To receive a degree from ECDA, a student must complete the following:
1) Must have achieved a minimum cumulative academic grade of 71%
2) Must have a minimum 85% attendance for class
3) Must have successfully completed all applicable courses

4) Must have fulfilled all financial responsibilities with regard to ECDA and be in good standing
5) Must complete an exit interview with the career development department
6) Must complete the last 25% of his/her education on the main campus at ECDA.

3.2   When the student has completed all graduation requirements, the institution will award a Bachelor of Applied Science Degree.

**4.   TERMS AND CONDITIONS**

4.1   Eligible reasons for delaying a start after a student has already enrolled are:
1) Family death or serious illness
2) Uncontrolled events, natural disasters or
3) Military service. If a student must delay his/her start, he/she must notify the Admissions Department in writing at least 10 days prior to the scheduled start date. The start must be rescheduled within six months.

4.2   ECDA reserves the right to make adjustments in the official calendar of start dates. Such alterations will be officially announced no later than 3 months before the change occurs except when a change must be made due to an unforeseen event or a natural disaster. Because ECDA's refund policy is based on the time that classes have been in session, such changes will have no impact on the refund policy and its impact on students.

4.3   ECDA reserves the right to make changes in programs, materials, schedules, faculty and staff when such changes are in the best interest of the student and/or the institution. Changes in programs and schedules may alter a student's expected graduation date. Students will be responsible for fulfilling graduation requirements in effect when a student has enrolled, reenrolled after withdrawing, or been reinstated after a dismissal. Additional tuition may be required for coursework that is required because of such an enrollment change.

4.4   ECDA reserves the right to terminate this agreement in the event of:
1) violation of the standards of conduct
2) destruction of property by the student
3) non-payment of tuition & fees
4) unsatisfactory academic progress
5) poor attendance

4.5   The student's dissatisfaction with or non-receipt of educational services offered by ECDA does not excuse the student from repayment of any private loan, state loan or grant, federal loan, SLS, or other loan whatsoever made to the student for enrollment and completion of training at ECDA.

4.6   ECDA offers occupational training, not employment. ECDA provides placement assistance, but makes no guarantee of job placement or employment.
Student Initials: _SD_. I have received a copy of the school's Performance Fact Sheet, which details completion and placement statistics.

**5.   BUYER'S RIGHT TO CANCEL**

5.1   The student may terminate this agreement by giving written notice by midnight of the fifth business day following the date of this agreement to the Office of the VP of Admissions, Ex'pression College for Digital Arts, 6601 Shellmound Street, Emeryville, CA 94608.

5.2   Students who have not visited the school prior to enrollment will have the opportunity to withdraw without penalty within five business days following either the regularly scheduled orientation or following a tour of the school facilities and inspection of equipment where training and services are provided.
Student Initials: _SD_. I have had a tour of the school.

---

WHITE COPY – ADMISSIONS    YELLOW COPY – REGISTRAR    PINK COPY – STUDENT
REV 06.06

ATTACHMENT A

### 6. ARBITRATION AGREEMENT

6.1 Any dispute arising from enrollment at Ex'pression College for Digital Arts, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") at Emeryville, California, under its Commercial Rules. All determinations as to the scope, enforceability of this Arbitration Agreement shall be determined by the Arbitrator, and not by a court. The award rendered by the arbitrator may be entered in any court having jurisdiction.

Student Initials: _____ I have read and understand the Arbitration Agreement.

### 7. REFUND POLICY

7.1 **Cancellation or Withdrawal Prior to Start of Instruction**
The school will refund all charges less $95 for the non-refundable application fee ($10 for Veterans) if the enrollment agreement is cancelled prior to the first day of instruction or if a student withdraws within five days after orientation.

7.2 **Withdrawal or Termination Prior to Completion of Enrollment Period**
If a student wishes to withdraw from ECDA he/she must make notification in writing to the Office of the Registrar at 6601 Shellmound St. Emeryville, CA 94608. If the student withdraws he/she will receive a pro-rata refund if the student has completed 60% or less of the academic year for which the student was charged. If the student has completed more than 60% of the academic year for which the student was charged, the tuition is considered earned and the student will receive no refund. Refunds will be calculated on the basis of the last day of actual attendance. Refunds will be paid within 30 days following the date the student notifies the Office of the Registrar of withdrawal or if the student is terminated from school a refund will be paid within 30 days following the date the student was notified of termination. A non-refundable Administrative Fee of $95 will be charged for all students who withdraw or are terminated prior to completion of the enrollment period. The method for calculating a pro-rata refund is:

Total tuition charged for the academic year / total number of clock hours for the academic year = per clock hour tuition.

Per clock hour tuition x number of clock hours incurred = total tuition owed by student.

Total tuition owed by student + administrative fee = total owed by student.

Total tuition paid for academic year – total owed by student = refund amount.

The above policy complies with State of California requirements.

7.3 **Return of Federal Funds**
Refunds are allocated to financial sources in accordance with Federal Department of Education regulations. Regulations require refunds for students who receive Federal grants and/or loans and withdrew during their period of enrollment to be returned to the Federal Government. Additional information on return of Federal Funds is available through the Financial Aid Office.

### 8. STUDENT TUITION RECOVERY FUND

8.1 As of January 1, 2002, California Education Code Section 94945 requires all colleges in the State of California licensed by the Bureau of Private Postsecondary and Vocational Education (BPPVE) to collect a fee from every new student to be remitted to the California Student Tuition Recovery Fund (STRF). This fund is administered by the State of California's BPPVE. The STRF assessment rate for enrollment agreements signed on or after January 1, 2003 is $2.50 per $1000 of tuition charged (rounded to the nearest 1,000). Based on ECDA's tuition of $ _____ your STRF fee is $ _____ Non-Californian residents or recipients of third party payor tuition are not eligible for protection under and recovery from the Student Tuition Recovery Fund and are not required to pay the STRF fee. The STRF fee is due on the start date, unless the State of California has determined that no assessment shall be levied pursuant to California Education Code Section 94945.

### 9. TUITION, FEES, METHOD AND TERMS OF PAYMENT

9.1 **Tuition & Fees**
- Tuition for academic year _____ for the program of enrollment is $ 16,950
- Application Fee of $95 or $10 for Veterans (For new students only; to be submitted with Application for Admission. This is a non-refundable fee.)
- Returned Check Fee of $50 (Charged for all checks returned for non-sufficient funds. The student is responsible for all late payment fees and collection costs for past due balances and will pay bank fees and charges for returned checks.)

- Late fee of $50 (W____ charged if a payment is five or more days late. This is a non-refundable fee.)
- Installment Fee of $25 per installment (if the student chooses payment Option 3. This is a non-refundable fee.)

Tuition includes all materials, books (General Education books are the property of ECDA and must be returned), and equipment required for the entire program such as: associated course books, art supplies, and relevant materials. Charges for repeated courses are not included in the above and are calculated at the per credit unit rate effective at the time of re-take. The tuition and other charges noted above are solely for one academic year. In order to complete the program of enrollment, it is necessary that the student pay tuition for every remaining academic year required to complete the program. (Four academic years are required for completion of a Bachelor of Applied Science Degree.)

9.2 The school reserves the right to change tuition rates. The tuition rates quoted in this enrollment agreement will remain in effect only for one academic year. Tuition for each succeeding academic year will be charged at the published tuition rate for that year. Changes in tuition will be announced five (5) weeks before they become effective. If a student withdraws and reenters or is reinstated after a dismissal he/she may also be subject to new tuition rates. Students who have prepaid tuition for the entire program will have no change in tuition unless they withdraw and reenter or are reinstated after a dismissal.

9.3 The student will meet with the Financial Aid Office before the beginning of each academic year and review payment options and student loan information. Payment amounts and due dates are based on the payment option chosen by the student. If the student elects a payment plan, it will be in compliance with the Federal Truth in Lending retail installment requirements and will become part of this enrollment agreement.

9.4 All payments must be in US dollars and made by check, money order, or cash to Ex'pression College for Digital Arts and are due in accordance with the payment option chosen.

## 10. NOTICE CONCERNING TRANSFERABILITY OF UNITS AND DEGREES EARNED AT OUR SCHOOL

**Units you earn in our degree program in most cases will probably not be transferable to any other college or university. For example if you entered our school as a freshman, you will still be a freshman if you enter another college or university at some time in the future even though you earned units here at our school. In addition, if you earn a degree, diploma, or certificate in our degree program, in most cases it will probably not serve as a basis for obtaining a higher level degree at another college or university.**

**Student Initials: _____ I have read and understand the Notice Concerning Transferability of Units and Degrees Earned at Ex'pression.**

**My signature below certifies that I have read, understood, and agreed to my rights and responsibilities, and that the institution's cancellation and refund policies and arbitration clause have been clearly explained to me. I have received a copy of this agreement.**

_Samuel W_
SIGNATURE OF STUDENT    DATE    SIGNATURE OF PARENT OR GUARDIAN    DATE

_Dathan Kidd    9/18/06_
SIGNATURE OF SCHOOL OFFICIAL    DATE OF ACCEPTANCE

WHITE COPY — ADMISSIONS    YELLOW COPY — REGISTRAR    PINK COPY — STUDENT
REV 06.06

# Exhibit B

1  Thomas H. Clarke, Jr. (SBN 47592)
   Andrew M. Wolfe (SBN 114076)
2  **ROPERS, MAJESKI, KOHN & BENTLEY**
   201 Spear Street, Suite 1000
3  San Francisco, CA 94105
   Telephone: 415.543.4800
4  Facsimile: 415.972.6301
   E-Mail:  tclarke@rmkb.com;
5  awolfe@rmkb.com

6  Attorneys for Plaintiff
   Samuel DiGiacomo
7

8  Eric J. Sinrod  (SBN 122868)
   Michael J. Dickman (SBN 227096)
9  **DUANE MORRIS LLP**
   One Market, Spear Tower, Suite 2000
10 San Francisco, CA 94105-1104
   Telephone: 415.957.3000
11 Facsimile: 415.957.3001
   E-Mail: ejsinrod@duanemorris.com;
12 mjdickman@duanemorris.com

13 Attorneys for Defendant
   Ex'pression Center For New Media
14

15              IN THE UNITED STATES DISTRICT COURT

16            FOR THE NORTHERN DISTRICT OF CALIFORNIA

17

18 SAMUEL DIGIACOMO,                    | Case No.: C08-01768-MHP

19              Plaintiff,              | **JOINT CASE MANAGEMENT
                                        | STATEMENT**
20      v.
                                        | [FRCP 16, 26; Civ. L-R 16-10]
21 EX'PRESSION CENTER FOR NEW MEDIA,
   INC., d/b/a EX'PRESSION COLLEGE FOR | Judge:      Hon. Marilyn H. Patel
22 DIGITAL ARTS, et al.,               | Date:       August 18, 2008
                                        | Time:       4:00 P.M.
23              Defendants.

24                                      | Complaint Filed:    April 2, 2008

25

26      Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Civil Local Rule 16-9,

27 and in accordance with the Court's Standing Order Re Case Management Conference, Plaintiff

28 Samuel DiGiacomo ("Plaintiff") and Defendant Ex'pression Center for New Media d/b/a

RC1/5164280.1/CB12                    - 1 -

JOINT CASE MANAGEMENT STATEMENT

ATTACHMENT B

*(side margin, vertical text)* Ropers Majeski Kohn & Bentley  A Professional Corporation  San Francisco

1    Ex'pression College for Digital Arts ("Defendant" or "Ex'pression") hereby submit this Joint

2    Case Management Statement in advance of the Initial Case Management Conference scheduled

3    on August 18, 2008.

## I.    DISPUTE CONCERNING ARBITRABILITY

5        This lawsuit involves a dispute between a former student and a private vocational school.

6    Plaintiff is a former student of Defendant Ex'pression Center for New Media, a private post-

7    secondary vocational school located in Emeryville, California that specializes in digital sound and

8    visual arts.  Plaintiff alleges that during his entire life he has suffered from Asperger's Syndrome

9    and that this syndrome is a form of autism.[1]  Plaintiff was enrolled in one of Ex'pression's

10   educational programs from approximately September 2006 until April 2007 when Plaintiff's

11   enrollment was terminated.  Prior to termination he had successfully completed three semesters of

12   study.  Plaintiff filed this action alleging violations of both federal and state law arising out of his

13   termination from Defendant's educational program.  The parties dispute the factual basis and/or

14   reasons for Plaintiff's termination from the program.

15       Plaintiff contends that the termination decision was based on the false and perjured

16   statements of former roommates who, unfortunately, were drug abusers, and that any other

17   conduct that Defendant cites is merely puffery created after the lawsuit was filed.  Plaintiff

18   contends that his evidence will show: (1) that both of the complainants against him were former

19   roommates who had been terminated from their tenancy because of their drug addiction and

20   drug-related misconduct; and (2) that one of those complainants was arrested by Emeryville

21   Police when, following his eviction, he tried to break into the apartment he formerly shared with

22   Plaintiff.

23       Ex'pression disputes Plaintiff's version of the facts, and Defendant contends that Plaintiff's

24   termination was justified under the circumstances in that Plaintiff's behavior was disruptive to the

25   educational process and threatening to faculty and other students.  Defendant denies that any of

26

27   [1] Plaintiff also contends that he suffers from bipolar disorder (also known as manic depression); that this condition, like his Asperger's Syndrome, was made known to Defendant at the time of his enrollment; and that at the time of his
28   enrollment, his mother offered the school copies of medical records showing his diagnosis with these two disorders. Plaintiff will add allegations regarding this disorder to the complaint when it is next amended.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    its conduct was unlawful in any way.

2        Ex'pression asserts this case is subject to mandatory arbitration under the Federal

3    Arbitration Act. As part of his enrollment into Defendant's educational program, Plaintiff

4    executed an Enrollment Agreement which contains an arbitration clause. As a result, Defendant

5    contends that Plaintiff's claims must be referred to binding arbitration under the Federal

6    Arbitration Act. Plaintiff, however, contends that the arbitration clause contained in the

7    Enrollment Agreement is unenforceable because, inter alia, it is procedurally and substantively

8    unconscionable and, as result, his claims may proceed in this Court.

9        In early June 2008, Defendant's counsel advised Plaintiff's counsel that this matter was

10    subject to the arbitration clause. Plaintiff's counsel responded that this matter should not be

11    referred to arbitration because that clause was invalid as a matter of law. This motion has been

12    scheduled as follows:

13        August 18, 2008 -- Plaintiff's Opposition Due

14        August 25, 2008 -- Defendant's Reply Due

15        September 8, 2008 -- Hearing on Motion to Compel Arbitration

16        For the sake of judicial economy and to avoid potentially unnecessary time, effort and

17    expenses, the parties agree that this case should be stayed until such time as this Court enters an

18    order on Defendant's motion to compel arbitration.

19    **II.**      **DISCUSSION OF CASE MANAGEMENT SUBJECTS**

20        In light of the arbitration dispute discussed above, the parties believe that it is premature

21    to address most of the subjects required in a Joint Case Management Statement pursuant to this

22    Court's standing order. Those subjects which address case management, discovery, and

23    scheduling would become moot in the event the Court grants the Motion to Compel Arbitration.

24    Nonetheless, the parties have attempted to address those subjects in good faith, which are

25    discussed below.

26        **1.**      **Jurisdiction and Service.**

27        Plaintiff's complaint asserts that this Court has subject matter jurisdiction in this matter

28    pursuant to 28 U.S.C. sections 1331, in that this case arises out of alleged violations of the

1    Rehabilitation Act of 1973, codified at 29 U.S.C. section 701, *et seq.*, and seeks declaratory relief

2    pursuant to 28 U.S.C. section 2201. Plaintiff further asserts this Court has supplemental

3    jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. section 1367(a) in that such

4    state law claims arise out of the same case or controversy under Article III of the United State

5    Constitution. As discussed above, Defendant contends this action is subject to mandatory

6    arbitration under the Federal Arbitration Act.

7         Defendant's counsel agreed to accept service of the complaint, and Plaintiff served his

8    complaint on counsel for Defendant on May 27, 2008. On May 29, 2008, Defendant's counsel

9    returned an executed copy of Waiver of Service of Summons to Plaintiff's counsel. The parties

10    have agreed that Ex'pression need not respond to the complaint until after the Court decides

11    Ex'pression's motion to compel arbitration.

12         **2.    Brief Statement of Facts.**

13         The parties' factual contentions are set forth in Section I above.

14         **3.    Legal Issues.**

15         Plaintiff contends that Defendant violated both federal and state law in connection with

16    Plaintiff's termination from Defendant's educational program. To that end, Plaintiff alleges six

17    causes of action against Defendant for alleged violations of the Rehabilitation Act of 1973 under

18    29 U.S.C. section 701, *et seq.*, alleged discrimination in violation of California Government Code

19    sections 11135 and 11139, alleged violations of the Unruh Civil Rights Act under California Civil

20    Code section 51, alleged violations of the California Unfair Competition Law under California

21    Business and Professions Code section 17200, alleged violations of a common law right to fair

22    procedure under California law, and seeks declaratory relief under 28 U.S.C. section 2201 and

23    California Code of Civil Procedure section 1060. Defendant denies that its conduct was unlawful

24    in any manner, or that Plaintiff is entitled to relief of any kind. Further, Defendant contends this

25    matter is subject to mandatory binding arbitration under the Federal Arbitration Act.

26         **4.    Motions.**

27         As mentioned above, Plaintiff and Defendant dispute whether this case is subject to

28    mandatory arbitration under the Federal Arbitration Act. As a result, the parties believe it is

RCI/5164280.1/CB12                           - 4 -

JOINT CASE MANAGEMENT STATEMENT

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  premature to address the nature and scope of any anticipated motions beyond Defendant's motion

2  to compel arbitration.

3      **5.     Amendment of Pleadings.**

4      At present, Plaintiff does not anticipate amending his complaint.  Defendant has not yet

5  responded to the complaint, and the parties have agreed that Defendant need not respond until

6  after the Court decides Defendant's motion to compel arbitration.  In the event the Court denies

7  Defendant's motion to compel arbitration, the parties agreed during the meet and confer process

8  that Defendant would file its responsive pleading no later than 30 days after entry of the Court's

9  order denying the motion.

10     **6.     Evidence Preservation.**

11     Counsel for both parties have informed their respective clients of the necessity of

12 preserving all potentially relevant documentation and electronic information, and requested that

13 all such documentation and/or information be preserved.

14     **7.     Initial Disclosures.**

15     During the meet and confer process regarding the arbitration issue, the parties agreed to

16 postpone the time for service of Initial Disclosures pursuant to Rule 26 of the FRCP.  The parties

17 agree that in the event the Court denies the motion to compel arbitration, initial disclosures shall

18 be due 30 days after entry of the Court's order denying the motion.  If the motion to compel

19 arbitration is granted, the parties' Initial Disclosure obligations would be moot.

20     **8.     Discovery.**

21     As discussed above, the parties agree this case should be stayed pending a determination

22 of Defendant's motion to compel arbitration.  If the motion to compel arbitration is granted, the

23 parties' discovery obligations would be moot.  In the event the Court denies the motion to compel

24 arbitration, the parties will promptly meet and confer regarding a mutually agreeable discovery

25 plan for this case.

26     **9.     Class Actions.**

27     This case is not a class action.  However, Plaintiff has informed Defendant that if the

28 motion to compel arbitration is denied, Plaintiff may amend its complaint to state a class action.

RC1/5164280.1/CB12

- 5 -

JOINT CASE MANAGEMENT STATEMENT

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  In Plaintiff's view, if, as it now appears, Defendant has in fact inserted the same arbitration clause

2  in the enrollment forms it has required a large number (if not all) of its students to sign as a

3  precondition to becoming one of its students, the legality of Defendant's conduct may most

4  appropriately be determined on a class-wide basis. Defendant disagrees, and would oppose class

5  treatment in this case.

6      **10.    Related Cases.**

7      There are no cases related to this action.

8      **11.    Relief.**

9      In light of the arbitration issue, the parties believe it is premature to address the relief

10  sought in the complaint.

11      **12.    Settlement and ADR.**

12      To date, the parties have engaged in informal settlement discussions but have been unable

13  to resolve the case. During the meet and confer process on June 23, 2008, Plaintiff's counsel

14  indicated a willingness to mediate this dispute. Defendant contends that this matter is subject to

15  binding arbitration as discussed above.

16      **13.    Consent to Magistrate**

17      On or about June 26, 2008, Plaintiff objected to the assignment of a Magistrate Judge ,

18  which resulted in this matter being reassigned to this Court.

19      **14.    Other References.**

20      Defendant contends that this matter is subject to arbitration as set forth above. Beyond the

21  arbitration issue, the parties do not believe it would necessary to refer this case to a special master

22  or the Judicial Panel on Multidistrict Litigation.

23      **15.    Narrowing of Issues.**

24      At present, the parties believe it is premature to attempt to narrow the issues in this case in

25  light of the arbitration dispute.

26      **16.    Expedited Schedule.**

27      At present, the parties do not believe this case should be subject to an expedited schedule,

28  but should be governed by the applicable Federal Rules of Civil Procedure.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1      **17.**    **Scheduling.**

2      If the Court grants Defendant's motion to compel arbitration, the parties agree that

3  scheduling issues would be moot.  However, in the event the Court denies the motion, the parties

4  agree to meet and confer promptly in order to develop a mutually acceptable schedule for this

5  case.  During the meet and confer process, the parties agreed upon the following deadlines in the

6  event the Court denies the motion:

7      Initial Disclosures under Rule 26 -- 30 days after entry of order denying motion.

8      Defendant's response to complaint -- 30 days after entry of order denying motion.

9      **18.**    **Trial.**

10     In the event the Court denies Defendant's motion to compel arbitration, both parties

11 request a trial by jury in this matter.  The parties estimate that trial would last approximately two

12 weeks.

13     **19.**    **Disclosure of Interested Non-Parties.**

14     Pursuant to Civil Local Rule 3-16, the following persons and corporations have a financial

15 interest in Ex'pression Center for New Media d/b/a Ex'pression College for Digital Arts:  EJW,

16 Inc., a wholly owned subsidiary of Ex'tent, b.v., a Dutch corporation.  Ex'tent, b.v. is privately

17 owned by Carolien Wintzen.

18     **20.**    **Other Matters.**

19     None at this time.

20

21 Dated: August ___8___, 2008

                                  Respectfully submitted,
                                  **ROPERS MAJESKI KOHN & BENTLEY**

22

23                               By: _____

24                                   Thomas H. Clarke
                                  Attorneys for Plaintiff
                                  Samuel DiGiacomo

25

26

27

28

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Francisco*

1

Dated: August 7, 2008

DUANE MORRIS LLP

2

3

By: _____

Eric J. Sinrod
Michael J. Dickman
Attorneys for Defendant
Ex'pression Center For New Media

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

19

20

21

22

23

24

25

26

27

28

RC1/5163228.2/AMW

- 8 -

JOINT CASE MANAGEMENT STATEMENT

# Exhibit C

# ORDER

Cite as 2008 DJDAR 12742

PETER V. THOMPSON et al.,
Plaintiffs and Respondents,
v.
TOLL DUBLIN, LLC, et al.,
Defendants and Appellants.

No. A116856
(Alameda County
Super. Ct. No. VG-06-291972)
California Court of Appeal
First Appellate District
Division Two
Filed August 13, 2008

ORDER CERTIFYING OPINION
FOR PUBLICATION

THE COURT:

The opinion in the above-entitled matter filed on July 23, 2008 was not certified for publication in the Official Reports. For good cause, the request for publication by Respondents and interested parties is granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____

Kline, P.J.

# CONTRACTS

*Arbitration agreement is unenforceable against condominium buyers where provisions did not apply to fraud-related claims and were unconscionable.*

Cite as 2008 DJDAR 12742

PETER V. THOMPSON et al.,
Plaintiffs and Respondents,
v.
TOLL DUBLIN, LLC, et al.,
Defendants and Appellants.

No. A116856
(Alameda County
Super. Ct. No. VG-06-291972)
California Court of Appeal
First Appellate District
Division Two
Filed July 23, 2008 ████████

Defendants Toll Dublin, LLC (Toll Dublin), Toll Brothers Real Estate, Inc. (Toll Brothers), and James Whiteley Boyd (Boyd) (collectively, defendants) appeal the trial court's order denying their motion to compel arbitration after plaintiffs Peter V. Thompson, Deborah Thompson, Kim K. Thompson, Brooke Turner, Donna J. Covey, James Turner, Valerie Raymundo-Enrile, Efren D. Enrile, Jr., Alfred Toy, Jennie L. Toy, Sean Toy, Ai-Ling Chin, James C. Jung, Cynthia M. Lai, Joseph F. Castro, and Reno R. Arguello (collectively, plaintiffs) filed a lawsuit against defendants, raising various fraud-related claims arising from their purchase of condominiums built and/or sold by defendants.[1] Defendants claim that plaintiffs' lawsuit is precluded by an arbitration agreement previously entered into by both parties. Because we conclude (1) the arbitration agreement did not apply to plaintiffs' fraud-related claims, and (2) the arbitration provisions were, in any event, unconscionable and therefore unenforceable, we shall affirm the order.

## PROCEDURAL BACKGROUND

On October 3, 2006, plaintiffs filed a complaint for damages for (1) rescission based on fraud against Toll Dublin; (2) breach of fiduciary duty against Toll Brothers and Boyd; (3) constructive fraud against Toll Brothers and Boyd; (4) fraud against Toll Brothers and Boyd; (5) failure to disclose against Toll Brothers and Boyd; (6) breach of duty to be honest and truthful against Toll Brothers and Boyd; (7) rescission based on mutual mistake of fact against Toll Dublin; (8) rescission based on unilateral mistake of fact against Toll Dublin; and (9) fraudulent acts or practices (Bus. & Prof. Code, § 17200) against Toll Dublin.

On November 20, 2006, defendants filed a petition to compel arbitration and stay proceedings.

On January 11, 2007, the trial court denied defendants' motion to compel arbitration and stay proceedings.

On February 15, 2007, defendants filed a notice of appeal.

## FACTUAL BACKGROUND

During March and April 2005, plaintiffs entered into seven separate purchase agreements with Toll Dublin for the purchase of condominium units in Building 13 at the Villas in Dublin Ranch Villages. According to plaintiffs' complaint, during construction, Toll Dublin failed to take necessary precautions to keep the interior of Building 13 from becoming saturated with water; allowed mold to form and fester inside of Building 13; and had actual knowledge of the

---

[1] The complaint alleged that Toll Dublin "developed, planned, improved, designed, constructed, promoted, marketed, advertised and sold homes" in the Villas at Dublin Ranch Villages (the project), and that Toll Brothers and Boyd were ██████ estate agents and/or brokers involved in the sale of ██ es" at the project to plaintiffs.

ATTACHMENT C

wet, moldy, and unhealthful conditions, but hid and concealed these conditions from plaintiffs so that plaintiffs would close escrow on the problem homes. Plaintiffs' complaint also alleged that, shortly after plaintiffs closed escrow, in April and May 2006, "conditions inside Building 13 were so grave that [Toll Dublin] demanded that those plaintiffs that had actually moved in leave their new home and their belongings and relocate. Similarly, as to those plaintiffs that had not even moved into Building 13, [Toll Dublin] demanded· that they not move in. [¶] Since June 2006 and continuing through the date of this Complaint, plaintiffs have been excluded from Building 13 while [Toll Dublin has] attempted to decontaminate Building 13." The complaint further alleged that Toll Brothers and Boyd also became aware of the wet and moldy conditions that existed within Building 13 in the months before the close of escrow, but failed to disclose the existence of these conditions to plaintiffs, and that plaintiffs were unaware of the existence of these conditions prior to the close of escrow.

*DISCUSSION*

### I. Background

#### A. The Arbitration Provisions

In their purchase agreements, plaintiffs indicated, with their initials, that they had received copies of numerous additional documents— comprising some 800 pages—including, inter alia: a "Title 7 Addendum (Compliance with Civil Codes Sections 895, et seq.)" (Title 7 Addendum); a "Title 7 Master and Dispute Resolution Declaration (Compliance with Civil Code)" (Title 7 Master Declaration);[2] and a "Declaration of Covenants, Conditions and Restrictions of the Villas at Dublin Ranch Villages" (CC&Rs). A copy of Title 7 (Civ. Code, § 895 et seq.) was also included.

The Title 7 Addendum, a 10-page document, provided, inter alia, in its initial two paragraphs:

"1. TITLE 7–CIVIL CODE SECTIONS 895 ET SEQ.: The term 'Title 7' refers to Title 7, Part 2 of Division 2 of the California Civil Code, Sections 895–945.5. This Addendum and all of the documents attached to it exist for the purpose of implementing the requirements of Title 7. Title 7 does a variety of things. It establishes standards for the performance of the Property and allows Seller to impose additional standards on itself. . . . Title 7 also requires that Buyer be given a complete copy of Title 7 and certain written

---

[2] In their opposition to defendants' petition to compel arbitration and on appeal, plaintiffs denied receiving the Title 7 Master Declaration. In its ruling, the trial court acknowledged plaintiffs' contention that "they were not given an opportunity to see or review the Title 7 Master Declaration prior to their signatures on the Addendum agreeing that they did." The court's analysis, however, included a discussion of the Title 7 Master Declaration. For purposes of our analysis, we too shall assume, without deciding, that plaintiffs received a copy of the Title 7 Master Declaration before signing the Title 7 Addendum.

notifications. . . . [¶] . . . [¶]

"2. ATTACHED DOCUMENTS: Attached to this Addendum are the Master Declaration for Title 7 and Dispute Resolution ('Title 7 Master Declaration') and the Individual Declaration and Notices for Title 7 and Dispute Resolution ('Title 7 Individual Agreement'). . . . These two (2) documents and their exhibits implement the requirements of Title 7 and contain all of the items referred to in Paragraph 1, above."

In addition to subsequent paragraphs related to such matters as an· enhanced protection agreement, a fit and finish warranty, a maintenance manual, manufactured product information, and customer service information, it also provided information related to resolution of disputes, as follows:

"10. ALTERNATIVE DISPUTE RESOLUTION PROCEDURES: The Formal Claim Process described in Paragraph 9, above, provides a process intended to resolve disputes without filing an action (litigation or arbitration). If the Formal Claim Process does not result in a resolution of a dispute, or if a dispute is not subject to the Formal Claim Process, the dispute shall be resolved through the alternative binding dispute resolution procedures set forth in Sections 5.3 and 5.4 of the Title 7 Master Declaration which provide as follows:

"'ARBITRATION OF DISPUTES

"'5.3 Mandatory Binding Arbitration: Any Dispute between any Owner and Builder or between the Association and Builder shall be resolved through the procedures established in this Title 7 Master Declaration.

"'5.3.1 Federal Arbitration Act: If negotiations, mediation or other non-binding dispute resolution procedures, including the Formal Claim Process, fail to resolve the Dispute, then the Dispute shall be resolved by neutral, binding arbitration governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16) and not by any court action except as provided for judicial review of arbitration proceedings under the Federal Arbitration Act. . . . [¶] . . . [¶]

"'5.4 Other Dispute Provisions:

"'5.4.1 Judicial Reference: To the extent that either party may be otherwise entitled to bring an action at law or if a court of competent jurisdiction determines that the dispute resolution procedure set forth in Section 5.3 is void or unenforceable, the entire matter shall proceed as one of judicial reference pursuant to California Code of Civil Procedure Section 638 et seq.

"'5.4.2 Waiver of Jury Trial: BY TRANSFERRING TITLE AND BY TAKING TITLE TO PROPERTY, DECLARANT PARTIES, THE ASSOCIATION AND EACH OWNER GIVE UP AND WAIVE ANY RIGHT TO HAVE ANY DISPUTE TRIED BEFORE A JURY.'"

Following the "Arbitration of Disputes" provisions, the Title 7 Addendum contains the following language:

"STATUTORY NOTICE:

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT THE MATTERS [*sic*] INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

This language is followed by space for the buyer's, seller's, and affiliated general contractor's initials, all of which were initialed in each Title 7 Addendum.

Near the conclusion of the Title 7 Addendum, under the heading "16. BUYER ACKNOWLEDGEMENT OF REVIEW," the plaintiffs each initialed their copy in acknowledgement "that a complete copy of this Addendum and all documents attached to this Addendum were provided to Buyer for review on [date received inserted]. The reason for the delay between that date and the date of this Addendum was to permit Buyer to thoroughly review this Addendum and all documents attached to this Addendum. By signing this Addendum, Buyer agrees that it has been provided adequate opportunity to read and review this Addendum and all documents attached to this Addendum and that Buyer agrees to abide by all of the terms of this Addendum and all documents attached to this Addendum." On the last page of the Title 7 Addendum, Toll Dublin, Toll Brothers, and each plaintiff signed and dated the document.

The Title 7 Master Declaration, a 17-page document, which includes the "Arbitration of Disputes" provisions quoted in the Title 7 Addendum, defines the term "dispute" as follows:

"2.10 DISPUTE: The term 'Dispute' shall mean any claim, issue or controversy that arises from or is related in any way to (i) the Project, (ii) the relationship between Owner and Builder, or (iii) the relationship between the Association and Builder, whether contractual, statutory or in tort. The term 'Dispute' includes, but is not limited to claims, issues or controversies that arise from or are related to the purchase, sale, condition, design, construction or materials used in construction of any portion of the Project, the agreement between Declarant and an Owner to purchase a Condominium or any related agreement, an Enhanced Protection Agreement, a Fit & Finish Warranty, disclosures, or Issues. Disputes specifically include those relating to or arising out of any of the following:

"2.10.1 CLAIMED TITLE 7 VIOLATION: A claimed Title 7 Violation;

"2.10.2 PROPER REPAIR: Any disagreement as to whether a Claimed Title 7 Violation has been properly repaired;

"2.10.3 DAMAGES: Any disagreement as to the value of repairing a Claimed Title 7 Violation, the cost of repairing damage caused by the repair efforts . . . and all other fees and costs recoverable by contract or statute as a result of the Claimed Title 7 Violation; and

"2.10.4 TIMELINESS: Any disagreement concerning the timeliness of Builder's performance or an Owner's or the Association's notification under a Fit & Finish Warranty, an Enhanced Protection Agreement or the Formal Claim Process."

Only Toll Dublin and Toll Brothers signed this document, which was recorded on January 15, 2004, more than two years before any plaintiff closed escrow on a home.

The CC&Rs, a 40-page document (not including exhibits), which was recorded on May 23, 2003, also contains an arbitration provision, as follows:

"10.3 DISPUTES INVOLVING DECLARANT: Any disputes, claims, issues or controversies between any Owner and Declarant or between the Association and Declarant regarding any matters that arise from or are in any way related to the Project, the relationship between Owner and Declarant or the relationship between the Association and Declarant, whether contractual or tort, including, but not limited to, the purchase, sale, condition, design, construction or materials used in construction of any portion of the Project, the agreement between Declarant [and] Owner to purchase a Condominium or any related agreement, any Claimed Title 7 Violation as defined in the Title 7 Master Declaration or a deficiency as that term is defined in Section 896 of the California Civil Code shall be resolved in accordance with the Claims Processes and Dispute Resolution Procedures established in the applicable Title 7 Master Declaration."

A copy of Title 7, the statutory scheme contained in Civil Code section 895 et seq., which is concerned with construction defect claims, was also provided to plaintiffs and contains a provision that expressly excludes fraud claims: "[T]his title does not apply to any action by a claimant

to enforce a contract or express contractual provision, or any action for fraud, personal injury, or violation of statute." (Civ. Code, § 943, subd. (a); see also *id.*, § 931 [this part does not cover, inter alia, "fraud-based claims"].)

### B. The Trial Court's Ruling

The trial court denied defendants' motion to compel, concluding that the arbitration agreement was applicable only to claims brought pursuant to Title 7. The court first noted that the Title 7 Addendum states in its first paragraph that "[t]his Addendum and all of the documents attached to it exist for the purpose of implementing the requirements of Title 7." The court found that "[t]his language cannot be interpreted in any way other than that, unless specifically exempted by specific language in the Title 7 Addendum, the purpose of the Title 7 Addendum is for the sole purpose of implementing each of the requirements of Civil Code §§ 895–945.5. [¶] An analysis of the statutory scheme supports the conclusion that the claims at issue in this case are not subject to arbitration." The court then observed that "Title 7 concerns itself exclusively with actions relating to construction defects in new construction projects" and that causes of action for, inter alia, fraud were explicitly excluded from Title 7's statutory scheme. (See Civ. Code, §§ 931, 943.)

The court then stated that the contractual language of the Title 7 Addendum also supported its conclusion that the claims at issue were not subject to arbitration since, "[u]nlike the specific reference found in paragraph 3 of the Title 7 Addendum where it states that 'Seller . . . has elected not to be subject to the provisions of Chapter 2 of Title 7' (Civil Code §§ 896-897), there is no language in the Title 7 Addendum stating that the breadth of disputes covered by the arbitration agreement found in paragraph 10 of the Title 7 Addendum is different or contrary to the rather specific language found in Civil Code §§ 931 or 943."

The court then stated that the language in paragraph 10 of the Title 7 Addendum regarding a "dispute [that] is not subject to the formal claims process" was, at best, ambiguous insofar as that language refers to "a construction defect dispute or if it is intended to include fraud claims notwithstanding their specific exclusion by Civil Code § 943. [¶] Compounding the ambiguity, the [Title 7 Master Declaration] at paragraph 2.10, 'Dispute' in broad and general language and then explains it 'specifically' includes claims 'relating to or arising out of any of the following:' and then lists four different types of claims, each of which relates directly to a construction defect type of dispute. . . . The Title 7 Master Declaration, in five, single-spaced pages . . . describes the 'Formal Claims Process' in exhaustive detail yet it never describes any act or process that could apply to any type of dispute other than one relating directly to a construction defect dispute." (Fn. omitted.)

The court concluded: "It is unreasonable to interpret the general language of either the Title 7 Addendum or the Title 7 Master Declaration as contradicting or superseding the specific language found in Civil Code § 943 which operates to exclude the type of fraud action filed herein from the remedies and procedures required by Title 7. [¶] It directly follows that the arbitration provisions contained in the Title 7 Addendum and in the Title 7 Master Declaration do not apply to the claims alleged by Plaintiffs in their Complaint."

### II. Standard of Review

On appeal from the denial of a motion to compel arbitration, " 'we review the arbitration agreement de novo' to determine whether it is 'legally enforceable,' applying general principles of California contract law. [Citations.] [Citation.]" (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892 (*Baker*).) Unconscionability is a question of law subject to de novo review, "although factual issues may bear on that determination. [Citation.]" (*Ibid;* accord, *Murphy v. Check 'n Go of California, Inc.* (2007) 156 Cal.App.4th 138, 144.)

### III. Breadth of the Arbitration Provisions

We agree with the trial court's conclusion, based on both the Title 7 statutory scheme and the contractual language of the agreement between the parties, that the dispute resolution provisions in the Title 7 Addendum and the Title 7 Master Declaration apply only to Title 7 claims. First, the Title 7 Addendum states that "[t]his Addendum and all of the documents attached to it exist for the purpose of implementing the requirements of Title 7," which is expressly limited to actions involving construction defects in new construction projects.

Second, although read in isolation, the provision in the Title 7 Addendum regarding disputes "not subject to the formal claims process" (¶ 10) and the broad definition of "Dispute" in the Title 7 Master Declaration (¶ 2.10) could possibly be read to apply to disputes other than Title 7-related actions, in the context of the entire arbitration agreement, these general provisions cannot reasonably be interpreted to apply to non-Title 7 claims. (See, e.g., *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 919 [on review, "[w]e consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation"].) This is particularly true given the fact that the relevant documents' captions all refer to Title 7 and the specific language solely invokes Title 7, with no description of any possible claim other than those related to Title 7. (See, e.g., *McNeely v. Claremont Management Co.* (1962) 210 Cal.App.2d 749, 753 [where general and particular contract provision are inconsistent, particular controls general]; see also Code Civ. Proc., § 1859.)

Defendants argue that, in light of the strong policy in favor of arbitration and the mandate that doubts about the scope of arbitrable issues should be resolved in favor of arbitration (see, e.g., *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 25-26; *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311,

1320-1321), any doubt or ambiguity regarding whether the arbitration agreement does in fact cover plaintiffs' claims should be resolved in favor of those claims' arbitrability. We disagree. The strong policy in favor of arbitration may not be used to permit a party to enforce provisions of an arbitration agreement that, as here, either do not exist or were so poorly drafted that another party cannot be presumed to have 'agreed to them. (See, e.g., *EFund Capital Partners v. Pless*, at p. 1321 [" ' " The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract [including an arbitration agreement] must give effect to the *"mutual intention"* of the parties' " ' "], quoting *TRB Investments, Inc. v. Fireman's Fund Ins. Co* (2006) 40 Cal.4th 19, 27, italics added.)

Thus, because the arbitration does not include non-Title 7 claims such as those raised in this action, the dispute resolution provisions in the Title 7 Addendum and the Title 7 Master Declaration do not apply to plaintiffs' action. (See *Baker, supra*, 159 Cal.App.4th at pp. 893-894.)[3]

Moreover, even assuming the arbitration provisions in question could somehow be construed to cover non-Title 7 claims, we would still affirm the trial court's order because the provisions are unconscionable and hence unenforceable.

## IV. *Unconscionability*

Although the trial court's denial of defendants' motion to compel was not based on unconscionability, because the issue of unconscionability "is solely one of law [citation], is potentially dispositive, and because the parties' arguments on the issue are fully contained in the

record, we address the issue here." (*Greenbriar Homes Communities, Inc. v. Superior Court* (2004) 117 Cal.App.4th 337, 343.)

The doctrine of unconscionability " 'has both a "procedural" and a "substantive" element,' the former focusing on '"oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. . . . In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*); see also Civ. Code, § 1670.5.)

In *Armendariz, supra,* 24 Cal.4th 83, our Supreme Court further explained that unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion. [Citation.] 'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.] If the contract is adhesive, the court must then determine whether 'other factors are present which, under established legal rules—legislative or judicial—operate to render it [unenforceable].' [Citation.]" (*Id.* at p. 113.) The court went on to explain: " 'Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. [Citation.] The second— a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, is unduly oppressive or "unconscionable." [Citation.] Subsequent cases have referred to both the 'reasonable expectations' and the 'oppressive' limitations as being aspects of unconscionability. [Citations.]" (*Ibid.*)

Here, we conclude that the arbitration provisions in question were part of a contract of adhesion. "The reality of the transaction was that plaintiffs had to accept the arbitration provisions if they wanted to buy a house. The arbitration provisions were part of a preprinted form contract, presented on a take-it-or-leave-it basis." (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1293 (*Bruni*); accord, *Pardee Construction Co. v.*

---

[3] Defendants mistakenly rely on Civil Code section 914, subdivision (b), which provides: "Nothing in this title is intended to affect existing statutory or decisional law pertaining to the applicability, viability, or enforceability of alternative dispute resolution methods, alternative remedies, or *contractual arbitration*, judicial reference, or similar procedures requiring a binding resolution to enforce the other chapters of this title *or any other disputes between homeowners and builders*. Nothing in this title is intended to affect the applicability, viability, or enforceability, if any, of contractual arbitration or judicial reference after a nonadversarial procedure or provision has been completed." (Italics added.) According to defendants, the trial court improperly ignored this section when it found that non-Title 7 claims were precluded from Title 7's statutory scheme.

We do not believe the trial court's ruling implies that whenever provisions related to Title 7 construction defect claims are included in an arbitration agreement, non-non-Title 7 dispute provisions may also be included in that agreement. Clearly, inclusion of such provisions is permitted. (See Civ. Code, § 914, subd. (b).) In the particular circumstances of this case, however, the trial court correctly concluded that the language of the arbitration agreement does not include non-Title 7 claims but, rather, applies only to Title 7-related disputes, which expressly exclude fraud-related claims of the type raised here. (See Civ. Code, §§ 931, 943.)

---

[4] While, as previously noted, there is a factual dispute as to whether the plaintiffs received the Title 7 Master Declaration before signing the Title 7 Addendum, resolution of that dispute is not necessary to our unconscionability determination.

*Superior Court* (2002) 100 Cal.App.4th 1081, 1087 (*Pardee*).) Indeed, as previously noted, the Title 7 Master Declaration was signed solely by Toll Dublin and Toll Brothers and was recorded on January 15, 2004, more than two years before any plaintiff closed escrow on a home, which strongly suggests that these provisions were imposed on all buyers of the 264-home project.

These facts also demonstrate "oppression," which " 'arises from an inequality of bargaining power of the parties to the contact and an absence of real negotiation or a meaningful choice on the part of the weaker party.' " (*Pardee, supra*, 100 Cal.App.4th at p. 1089; accord, *Villa Milano Homeowners Assn. v. Il Davorge* (2000) 84 Cal.App.4th 819, 828-829 [where CC&Rs containing arbitration provisions "were drafted in toto by the developer and recorded years before the purchasers ever came to buy," oppression component of unconscionability was demonstrated]; compare *Trend Homes, Inc. v. Superior Court* (2005) 131 Cal.App.4th 950, 958-959 [finding no procedural unconscionability where there was no evidence, inter alia, that contested dispute resolution provision was included in every purchase agreement within development].)

Furthermore, the arbitration provisions, on their face, applied to a limited category of actions—Title 7 claims—and were included in approximately 800 pages of documents that were given to plaintiffs, which together comprised the purchase agreement. These facts reflect the "surprise" component of procedural unconscionability. (See *Pardee, supra*, 100 Cal. App.4th at pp. 1089-1090 [relevant provisions were buried in contract, language did not fully explain provisions, and one provision contained a misleading caption].)

Accordingly, in this contract of adhesion, oppression and surprise due to unequal bargaining power are both present, rendering the arbitration provisions procedurally unconscionable. (See *Armendariz, supra*, 24 Cal.4th at pp. 113-114.)

In addition, substantive unconscionability is present here. The purported inclusion of non-Title 7 claims in the arbitration provisions (see pt. III., *ante*), rendered the scope of the arbitration provisions unforeseeably broad, which would not have been within the reasonable expectations of the plaintiffs. (See *Bruni, supra*, 160 Cal.App.4th at p. 1293.) Given that both the trial court and this court have concluded that the arbitration provisions, on their face, covered only Title 7 claims, to uphold defendants' interpretation that these provisions in fact included fraud-related claims would undoubtedly "shock the conscience." (See *id.* at pp. 1288-1289.) Finally, the arbitration provisions are unfairly one-sided in that defendants, "as the builder and seller of plaintiffs' homes, would have no conceivable reason to institute legal proceedings against a homeowner after escrow closed, but virtually every claim the homeowners might raise against [the builder and seller] would be subject to arbitration." (*Baker, supra*, 159 Cal.App.4th at p. 896.)

In light of the pervasiveness of the unconscionable provisions related to arbitration

and the fact that the purported scope of the arbitration provisions exceeded the plaintiffs' reasonable expectations, there are no isolated provisions that can be severed and the arbitration provisions as a whole are unenforceable against plaintiffs. (See *Armendariz, supra*, 24 Cal.4th at p. 124 ["If the central purpose of the contract is tainted with illegality, then the contact as a whole cannot be enforced"]; see also *Bruni, supra*, 160 Cal.App.4th at p. 1295; Civ. Code, § 1670.5.)[5]

### DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed. Costs on appeal are awarded to plaintiffs.

Kline, P.J.

We concur:
Haerle, J.
Richman, J.

Trial Court:
Alameda County Superior Court

Trial Judge:
Hon. Frank Roesch

Attorneys for Appellants:
Morgan Miller Blair, a Law Corporation
Kenneth M. Miller
Steven N. Holland
Kevin R. Brodehl

Attorneys for Respondents:
Berding & Weil LLP
Scott W. Barton
Steven R. Weinmann

---

[5] In their reply brief, defendants assert that, if we should find that the arbitration provisions do not govern plaintiffs' claims, the Title 7 Addendum requires that the claims be submitted to judicial reference. First, we will not consider an argument first raised in a reply brief absent a showing why the issue could not have been raised earlier. (See, e.g., *Keiffer v. Bechtel Corp.* (1998) 65 Cal.App.4th 893, 900.) Second, just as we have found that the arbitration provisions in the Title 7 Addendum and Title 7 Master Declaration do not apply to plaintiffs' claims, but instead are limited to Title 7-related issues, for the same reasons, we conclude that the judicial reference provisions in those same documents (located together with the arbitration provisions under the headings "Alternative Dispute Resolution Procedures" and "Arbitration of Disputes") are inapplicable to plaintiffs' non-Title 7 claims.

In addition, given our conclusion that the dispute resolution provisions do not apply to non-Title 7 claims and, further, that the arbitration agreement was unconscionable, we need not address plaintiffs' additional argument that the arbitration agreement was fraudulently procured.